PGBA, LLC, Plaintiff,

v.

UNITED STATES, Defendant,

Wisconsin Physicians Service Insurance Corporation, Intervening Defendant.

No. 03–2773–C.

United States Court of Federal Claims.

Filed Under Seal March 31, 2004.

Reissued April 22, 2004.

Kathleen E. Karelis, Miller & Chevalier Chartered, Washington, D.C., for plaintiff. W. Jay DeVecchio, Robert K. Huffman, Lisanne E.S. Cottington, Edward Jackson, and Jeffrey C. Walker, were of counsel.

Kyle Chadwick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, and Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Washington, D.C. Ellen Bonner, Assistant General Counsel, TRI-CARE Management Activity, Department of Defense, Aurora, CO, was of counsel.

Steven S. Diamond, Arnold & Porter LLP, Washington, D.C., for intervening defendant. Walter F. Zenner, Marc Stanislawczyk, Yohai Baisburd, Joseph M. Catoe, and Matthew H. Solomson, were of counsel.

## OPINION AND ORDER [1]

LETTOW, Judge.

This post-award bid protest is before the Court on plaintiff's motion for judgment upon

[1] An unredacted version of this opinion was issued under seal on March 31, 2004. The parties

the administrative record and the government's and intervening-defendant's cross-motions for judgment upon the administrative record. Plaintiff, PGBA, LLC ("PGBA"), filed this case to challenge the government's award of a contract for the processing of certain beneficiaries' claims under TRICARE, a military health care benefits program, to Wisconsin Physicians Service Insurance Corporation ("WPS"), the intervening-defendant. PGBA previously challenged the award through the bid protest procedures available before the General Accounting Office ("GAO"). The contracting agency, the Department of Defense, Military Health Care System, TRICARE Management Activity ("TMA"), overrode the automatic stay in place while the bid protest was pending before GAO. That override was enjoined by Judge Allegra of this Court, thus re-instituting the stay and preventing the government and WPS from beginning implementation of the contract during the pendency of the proceedings before GAO. *See PGBA, LLC v. United States,* 57 Fed.Cl. 655, 656–57 (2003). GAO ultimately denied PGBA's challenge, and the stay expired by operation of statute. PGBA filed this suit on December 3, 2003. The currently pending cross-motions have been fully briefed by the parties, and a hearing was conducted on March 3, 2004. For the reasons set forth below, the Court finds that the government committed errors that materially affected the bidding process adversely to PGBA. Applying 28 U.S.C. § 1491(b)(2), the Court declines to order injunctive or declaratory relief against the contractual award, but it concludes that PGBA is entitled to recover its reasonable costs incurred in bid preparation and proposal.

## BACKGROUND

### A. The Contract Solicitation

TRICARE is the government health care system that provides benefits to dependents of active duty service members as well as retired service members and their dependents. TMA administers TRICARE within the Department of Defense. TMA contracts with civilian companies to implement various aspects of the program. Over the course of the past several years, TMA has been undertaking a wide-reaching process of overhauling and restructuring this program in an effort to enhance the healthcare being provided and to reduce the costs being incurred. The contract specifically at issue in this case forms a part of this restructuring and involves the processing of claims made by "dual eligible" beneficiaries, that is, individuals who are eligible for coverage under both Medicare and TRICARE.

The TRICARE system is currently operated through a series of seven Managed Care Support ("MCS") contracts that cover eleven regions within the United States and around the world. Compl. ¶ 5. These MCS contracts have been in place since the early 1990s. *Id.* The MCS prime contractors each entered into subcontracts with one of two companies—PGBA or WPS—for the processing of beneficiaries' claims. PGBA performs this task under five of the contracts representing nine regions. Compl. ¶ 6. WPS garnered the remaining two subcontracts regarding two regions. *Id.*

In October 2000 Congress passed "TRICARE for Life" legislation, Pub.L. 106–398, Div. A, Title VII, § 712, 114 Stat. 1654A–176 (Oct. 30, 2000) (codified at 10 U.S.C. § 1086(d) and 42 U.S.C. § 1395ggg). Def.'s Counter–Stmt. of Facts at 3. Prior to the enactment of this statute, when an individual who was eligible for TRICARE benefits became eligible for coverage under Medicare due to age or health, such an individual would lose his or her eligibility for TRICARE benefits. Compl. ¶ 7. However, pursuant to the TRICARE for Life law, individuals eligible for Medicare coverage now remain eligible for TRICARE benefits, with Medicare typically serving as the primary payer and TRICARE as secondary payer,

---

thereafter proposed redactions of competition-sensitive, proprietary, and confidential material. The resulting redactions by the Court are represented by brackets enclosing asterisks "[\* \* \*]".

In addition, a timely motion for reconsideration of the Court's decision was filed by plaintiff.

That motion is denied by this reissued opinion and order. In that connection, the opinion has been amended to add this footnote and Section F of the Analysis and to revise what are now footnotes 11 and 30 from the version filed under seal.

reimbursing only those portions of a claim not covered by Medicare. Def.'s Counter–Stmt. of Facts at 3–4.[2] Upon passage of TRICARE for Life, TMA added the processing of dual-eligible beneficiaries' claims to the existing MCS contracts by way of modifications to those contracts. Compl. ¶ 8. The MCS prime contractors, in turn, modified their subcontracts to incorporate processing of this new class of claims. *Id.* Accordingly, PGBA, as a subcontractor, took responsibility for processing approximately 82% of the dual-eligible beneficiaries' claims, and WPS took on work regarding the remaining 18%. *See* Def.'s Counter–Stmt. of Facts at 4–5.

In 2002, TMA announced plans to reorganize the MCS system by consolidating the contracts and geographic coverage to three contracts covering three regions. Compl. ¶ 9. The new system of contracts is known as "TRICARE Next Generation" or "T–Nex." [3] The T–Nex adjustments to the TRICARE system also incorporate a revision of the claim processing system for dual-eligible beneficiaries, replacing the existing sub-contracting scheme with one stand-alone contract. This new contract will consolidate all claims processing for dual-eligible beneficiaries, without regard to the regional specifications related to the more comprehensive T–Nex contracts. TMA issued a Request for Proposals ("RFP") for the new contract, labeled the "TRICARE Dual Eligible Fiscal Intermediary Contract" or "TDEFIC," under Solicitation Number MDA906–02–R–007 on September 6, 2002. Compl. ¶ 12. The TDEFIC was intended to provide claims-processing and associated customer-support services for approximately 1.7 million dual-eligible TRICARE beneficiaries. *Id.* The provision of services under the TDEFIC is scheduled to begin on April 1, 2004. AR B. 15, T. 68.[4]

The TDEFIC solicitation set forth the following evaluation criteria upon which TMA would rate proposals received from potential contractors ("offerors"):

M–2.2.1. The extent to which the proposal exhibits a clear understanding of the work requirements and the means required to fulfill the requirements.

M–2.2.2. The extent to which the proposal demonstrates an ability to meet or exceed the requirements defined in the RFP and the quality of service which is likely to result from implementation of an offerors' [*sic*] proposed methods.

M–2.2.3. Feasibility of performing all RFP requirements within the total price proposed.

AR B. 8, T. 52 at 492. The solicitation also described evaluation factors and subfactors that would be considered by TMA in making its decision:

| | | |
|---|---|---|
| Factor 1 | | –Technical Merit (includes proposal risk) |
| | Subfactor 1 | –Claims Processing |
| | Subfactor 2 | –Beneficiary and Provider Satisfaction |
| | Subfactor 3 | –Effective Management Approach |
| | Subfactor 4 | –Transition In |
| | Subfactor 5 | –Data Access |
| Factor 2 | | –Past Performance |
| Factor 3 | | –Price |

AR B. 8, T. 52 at 493. The RFP stated that each of the three evaluation factors would be

---

**2.** In some instances, TRICARE covers categories of costs that Medicare does not, and in those instances TRICARE serves as the primary payer. *See* Hr'g Tr. at 50–52, 81.

**3.** TMA's conversion to these new contracts has itself not been without controversy. *See generally Sierra Military Health Servs., Inc. v. United States,* 58 Fed.Cl. 573 (2003).

**4.** "AR" refers to the Administrative Record provided to the Court, as supplemented, which consists of 52 "Books" ("B.") that are subdivided into 178 "Tabs" ("T.") as well as 11 video tapes ("Vid.") of oral presentations made by the three offerors.

weighted equally and that each of the subfactors under the "Technical Merit" factor would be weighted equally. AR B. 15, T. 100 at 307, ¶ M–4.1. All evaluation factors other than price, when combined, would be considered significantly more important than price alone. *Id.* If all competing proposals were approximately equal in terms of non-price factors, then TMA could award the contract to the offeror of the lowest price. *Id.* ¶ M–4.2.

For the "Technical Merit" factor and its related subfactors, each offeror's proposal was rated using a color-coding scheme in combination with a "risk" assessment—proposals were rated as "blue/exceptional," [5] "green/acceptable," [6] "yellow/marginal," or "red/unacceptable," along with either "low," "moderate," or "high" risk. AR B. 15, T. 99 at 271–72; *see also* Def.'s Counter–Stmt. of Facts at 10–13. For the "Past Performance" factor, each offeror was rated according to the confidence level that its performance under previous contracts instilled in the government's raters, with five ratings available: "high confidence," "confidence," "neutral," "little confidence," and "no confidence." AR B. 15, T. 99 at 272–73; *see also* Def.'s Counter–Stmt. of Facts at 20–21.

On February 12, 2003, PGBA, WPS, and Unisys Corporation ("Unisys") each submitted a proposal for TDEFIC. Compl. ¶ 16.[7] Each offeror also made an oral presentation to TMA, Compl. ¶ 16; AR Vids., and TMA held discussions with each of the offerors. Compl. ¶ 16; *see infra,* at 201. After the discussions, the offerors were given the opportunity to revise or amend their proposals, and all three submitted "Final Proposal Revisions" on April 28, 2003. Compl. ¶ 16.

## B. TMA's Consideration of the Proposals and Award to WPS

TMA employed a multiple-stage process in analyzing the three proposals, with responsibility for evaluating the proposals divided among various individuals and groups: a Contracting Officer, a Source Selection Authority ("SSA"), a Legal Advisor, and a Source Selection Evaluation Board ("SSEB") consisting of a Chair, a Source Selection Evaluation Team ("SSET"), a Performance Risk Assessment Group ("PRAG"), and a Price/Cost Team ("P/CT"). AR B. 15, T. 99 at 265–68. Major General Nancy Adams, U.S.A. Ret., was assigned to be the SSA for the TDEFIC solicitation. AR B. 15, T. 99 at 281. Tom Frey was assigned to be the Chair of the SSEB as well as the Acquisition Project Officer. *Id.* at 280–81. Five individuals were assigned to the SSET, with Major Weatherly Ryan as its Chair. *Id.* at 281. The PRAG consisted of three individuals with Captain Jeff White as its Chair, and the P/CT consisted of one individual, Sara Marcheggiani. *Id.* The SSET, PRAG, and P/CT were responsible for evaluating the proposals against the primary evaluation factors—Technical Merit, Past Performance, and Cost, respectively. *Id.* at 268–69. The Chair of the SSEB was assigned the task of writing a final report and making a "Best Value award recommendation" to the SSA, compiling the results of such evaluations. *Id.* at 267. General Adams was then responsible for making the official selection for award and documenting that selection in a "Source Selection Decision memorandum." *Id.* at 266.

As part of the SSEB's evaluation of the proposals, each offeror made an oral presentation to the evaluation teams. AR Vids.

5. TMA's Acquisition Plan defined a Blue rating as follows: "Exceeds minimum requirements in a manner beneficial to the Government; has no weaknesses. The offer has exceeded some requirements and is at least acceptable in all other requirements. Where exceeded, it must be documented by a strength(s) that is of clear benefit to the Government." AR B. 15, T. 99 at 271.

6. TMA's Acquisition Plan defined a Green rating as follows: "Meets minimum requirements. Any requirements exceeded in the offer are offset by one or more weaknesses. Weaknesses are readily correctable." AR B. 15, T. 99 at 271.

7. Prior to the submission of proposals, potential bidders were given the opportunity to submit written questions seeking clarification of various aspects of the RFP. *See* AR B. 41, T. 146. TMA made its written responses to such questions available to all potential bidders. *Id.* In sum, TMA answered 166 such questions. *Id.* TMA also held a pre-proposal conference on October 3, 2002, at which additional information on the solicitation was provided to potential bidders and questions were taken. *See* AR B. 41, T. 147–149.

Subsequent to such presentations, the SSEB assigned preliminary ratings to each of the offerors for each of the evaluation factors.

The SSEB's initial ratings for PGBA and WPS on the Technical Merit factor and its subfactors were as follows:

|  | PGBA | WPS |
| --- | --- | --- |
| Subfactor 1: Claims Processing | Yellow/Marginal Low Risk | Blue/Exceptional Low Risk |
| Subfactor 2: Beneficiary and Provider Satisfaction | Blue/Exceptional Low Risk | Blue/Exceptional Low Risk |
| Subfactor 3: Effective Management | Yellow/Marginal Low Risk | Green/Acceptable Low Risk |
| Subfactor 4: Transition In | Yellow/Marginal Low Risk | Blue/Exceptional Low Risk |
| Subfactor 5: Data Access | Yellow/Marginal Moderate Risk | Blue/Exceptional Low Risk |
| Overall Technical Rating | Yellow/Marginal Low Risk | Blue/Exceptional Low Risk |

AR B. 15, T. 94 at 218. Unisys was given an initial overall technical rating of Green/Acceptable and Moderate Risk. *Id.* Each offeror received an initial Past Performance rating of "Confidence." *Id.* at 213. The offerors' quoted prices in their initial proposals were:

PGBA      [* * *]
WPS      [* * *]
Unisys      [* * *]

*Id.* at 214.

Upon initial review, the SSEB also determined that all three proposals contained technical flaws and defects that would prevent award of a contract to any of the offerors. AR B. 15, T. 94 at 216. As a result, TMA elected to conduct additional discussions with each offeror to "afford TMA the opportunity to correct minor technical flaws in the RFP and [to] allow all the offerors an opportunity to improve upon their initial proposals." TMA prepared written questions to be addressed at such discussions, and the offerors were given the opportunity to engage in oral discussions on those issues with members of the SSEB, AR B. 42, T. 151–52, as well as the opportunity to provide written responses to such questions in their Final Proposal Revisions. AR B. 11, T. 61; AR B. 14, T. 67.

Following the discussions and the offerors' submission of their Final Proposal Revisions, the SSEB Chair presented his final recommendation to the SSA, recommending that the SSA adopt the following ratings in regard to Technical Merit:

|  | PGBA | WPS |
| --- | --- | --- |
| Subfactor 1: Claims Processing | Blue/Exceptional Low Risk | Blue/Exceptional Low Risk |
| Subfactor 2: Beneficiary and Provider Satisfaction | Blue/Exceptional Low Risk | Blue/Exceptional Low Risk |
| Subfactor 3: Effective Management | Green/Acceptable Low Risk | Green/Acceptable Low Risk |
| Subfactor 4: Transition In | Green/Acceptable Low Risk | Blue/Exceptional Low Risk |
| Subfactor 5: Data Access | Yellow/Marginal Low Risk | Blue/Exceptional Low Risk |
| Overall Technical Rating | Green/Acceptable Low Risk | Blue/Exceptional Low Risk |

AR B. 15, T. 71 at 47. Unisys received an overall Technical Merit rating of Green/Acceptable with Moderate Risk. *Id.* Each offeror again received a rating of "Confidence" on the Past Performance evaluation factor. *Id.* at 39. The offerors' final price quotes were:

| | |
|---|---|
| PGBA | [* * *] |
| WPS | $486,918,518 |
| Unisys | [* * *] |

*Id.* at 40.

Major General Adams then reviewed the proposals together with the SSEB's recommendations. She made one adjustment to the SSEB's rating of the offerors, raising PGBA's rating on the "Data Access" subfactor to "green" from "yellow." AR B. 15, T. 69 at 7–8; *see infra,* at 207. On July 25, 2003, TMA announced the award of the TDEFIC to WPS. AR B. 15, T. 68.

### C. Post–Award Proceedings

Both Unisys and PGBA filed post-award protests with GAO. Unisys filed its protest on August 5, 2003, and PGBA filed its protest on August 8, 2003. AR B. 1, T. 2; AR B. 2, T. 12; Compl. ¶ 18.[8] Under a provision of the Competition in Contracting Act of 1984, Pub.L. No. 98–369, Div. B, Title VII, § 2741(a), 98 Stat. 1200 (July 18, 1984) (codified, as amended, at 31 U.S.C. § 3553), an automatic stay of the award was engendered by these protests.[9] Thereafter, on August 16, 2003, TMA's Director of Acquisition Management and Support overrode the automatic stay pursuant to 31 U.S.C. § 3553(d)(3)(C). Less than a week later, on August 22, 2003, PGBA filed a complaint in this Court contesting the override decision and seeking an injunction against the override. On Septem-

ber 15, 2003, Judge Allegra of this Court issued a decision enjoining the override, thus reinstating the stay. *PGBA,* 57 Fed.Cl. at 656.

GAO denied both protests on November 17, 2003, AR B. 1, T. 1, and the automatic stay consequently expired by operation of law. PGBA filed this post-award review action on December 3, 2003. PGBA seeks a declaratory judgment that the award by TMA of the TDEFIC was arbitrary and capricious and contrary to law, along with an order vacating the award to TMA. Compl. at 14 (Prayer for Relief). As a result of proceedings under Rules of the Court of Federal Claims ("RCFC"), App. C, an agreed, expedited schedule for establishing the record and for briefing was adopted. In accord with that schedule, the government filed the administrative record, and PGBA, the government, and WPS each filed a motion for judgment upon that record pursuant to RCFC 56.1.

## ANALYSIS

As a general matter, PGBA has not challenged the procedural framework within which TMA reached its decision to award the contract to WPS. Rather, PGBA alleges that members of the SSEB as well as the SSA at various stages in the decision-making process acted improperly on procedural matters, favoring WPS over PGBA, and applied inappropriate evaluation criteria on the merits, failing to give PGBA high ratings while giving WPS undeservedly high marks. In particular, PGBA raises issues with the way

8. TMA had provided Unisys with a debriefing on July 31, 2003, AR B. 2, T. 12 at 19, and PGBA received a debriefing on August 4, 2003. AR B. 1, T. 2 at 26. Both Unisys's and PGBA's protests thus were filed within "5 days after the debriefing date offered to the unsuccessful offeror." 31 U.S.C. § 3553(d)(4)(B).

9. Upon receiving notice within either ten days of the contract award or five days after the debriefing date that the award is being protested, the awarding agency must "direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." 31 U.S.C. § 3553(d)(3)(A)(ii). "Performance [of the con-

tract] . . . may not be resumed while the protest is pending." *Id.* § 3553(d)(3)(B). The head of the contracting authority may nonetheless override this automatic stay upon a "written finding" either that "performance of the contract is in the best interests of the United States" or that "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." *Id.* § 3553(d)(3)(C). This Court has jurisdiction to review an agency decision to override an automatic stay. *See RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1291 (Fed.Cir. 1999); *PGBA,* 57 Fed.Cl. at 658.

in which its ratings on the "Data Access" and "Transition–In" subfactors and the Past Performance factor were derived as well as with the "discriminators" that TMA used to grant WPS high ratings on various elements. PGBA concludes by arguing that the purported benefits the government will supposedly derive from WPS's proposal do not justify the government's payment of WPS's premium of approximately $[* * *] million on the contract.

After first addressing the standards for this Court's decision in a bid protest case, the analysis which follows proceeds with an evaluation of PGBA's claims on the merits, starting with the technical subfactors underlying the SSA's decision. A concluding section deals with relief.

## A. Standards for Decision

■ Under 28 U.S.C. § 1491(b)(4), this Court's review of an agency's decision about a contractual solicitation or award takes place in accord with standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706.[10] Section 706 calls on a reviewing court to determine whether agency action is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court should only overturn a procurement decision where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001). *See also Gentex Corp. v. United States*, 58 Fed.Cl. 634, 648 (2003). An agency's decision can be found to lack a rational basis where "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Keeton Corr., Inc. v. United States*, 59 Fed.Cl. 753, 755 (2004) (quoting *Motor Vehicle Mfrs. Ass'n v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■ To prevail in a bid protest, a disappointed offeror must show both significant error in the procurement process and prejudice to its posture in the process. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed.Cir.2000). In effect, the plaintiff must "show that there is a substantial chance that it would have received the award but for the faulty evaluation." *TLT Constr. Corp.*, 50 Fed.Cl. 212, 216 (2001) (citing *Statistica v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996)).

In undertaking its review, this Court focuses on the record developed through the agency's proceedings, not a new record generated before the reviewing court. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). *But cf. Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989) (listing eight exceptions to the general rule, quoting Steven Stark and Sarah Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Action*, 36 Admin. L.Rev. 333, 345 (1984)). However, in this instance, as in many other bid protest cases, the administrative record certified by the agency also includes all of the materials newly developed during protest proceedings held before GAO, AR B. 1–5, 52, as well as in any related prior proceedings before this Court. AR B. 6. As was stated in *International Resource Recovery, Inc. v. United States*, 59 Fed.Cl. 537, 540–42 (2004):

As a practical matter, however, in most bid protests, the administrative record is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review.... The GAO record consists not only of the documentation supporting the agency action being reviewed, but also whatever documentation and argument, including affidavits and live testimony, a party submits to GAO.... In this Court, the GAO record is often submitted wholesale

---

**10.** This Court's jurisdiction over this case rests on 28 U.S.C. § 1491(b)(1). By statute, "[i]n any action under this subsection [*i.e.,* § 1491(b)], the

courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).

and designated as the administrative record by the Government.

In this case, the addendum to the record stemming from the GAO proceedings includes the transcripts of testimony given by witnesses at a GAO hearing. Notably, those witnesses included Major General Adams, the SSA. In examining this expanded record, this Court is mindful that it must critically examine any *post hoc* rationalization, *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Co–Steel Raritan, Inc. v. International Trade Comm'n,* 357 F.3d 1294, 1316 (Fed.Cir.2004), and that it "is not empowered to substitute its judgment for that of the agency." *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. Rather its focus should be on whether the agency considered the relevant factors and made a rational determination. *See Advanced Data Concepts,* 216 F.3d at 1057–58.[11]

### B. TMA's Evaluation of the Technical–Merit Factor

The main thrust of PGBA's challenge to TMA's award of the TDEFIC to WPS concerns the technical merit of the offerors' proposals. Four separate aspects of TMA's consideration are in dispute: (1) data access, (2) "transition in," (3) claims processing, and (4) customer satisfaction.

#### 1. The data-access subfactor.

■ In the RFP, TMA indicated that "data access" (subfactor 5) was important because it wished to insure that "Government designated individuals" had "ready access" to "contractor maintained data to support DoD's financial planning, health systems planning, medical resource management, clinical management, clinical research, and contract administration activities." AR B. 8, T. 52 at 478. The RFP stated that

> [m]inimum access shall include two authorizations at each MTF ["military treatment facility"], ten authorizations at each Surgeon General's Office, two authorizations at Health Affairs, two authorizations at TMA–Washington; two authorizations at TMA–Aurora; and authorization(s) (not to exceed two) for on-site Government representatives.

*Id.* at 22. PGBA proposed to fulfill this requirement of the RFP through the use of two pieces of software—"Execu-DASH," which provides an interface through which users may search and access "key performance data," and "Business Objects," which allows "online, real-time access" to "additional, detailed level claim and workload data." AR B 10, T. 56 at 353, 364. However, the "Data Access" section of PGBA's original proposal merely provided a description of PGBA's two software packages, *id.* at 354–63, coupled with the simple assertion that "PGBA commits to meeting the government's data requirements." *Id.* at 353, 364.

TMA's interest in how many government employees would be granted data access through PGBA's two software packages was initially expressed in a formal, written question provided to PGBA by Doris Navarro, the

---

11. For motions under RCFC 56.1, *i.e.,* for summary judgment upon review of agency decisions on the basis of an administrative record, summary judgment is appropriate if there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Application of that standard has two different templates in a case such as this. First, disputes of fact occurring in the procurement before the agency have either been addressed and resolved by the agency, and thus are tested by this Court under the arbitrary-and-capricious standard, *see Colorado Constr. Corp. v. United States,* 57 Fed. Cl. 648, 650 (2003), or they have remained undecided, and, if material to the outcome upon application of the arbitrary-and-capricious stan-

dard, would be the subject of a remand by this Court to the agency. *See* RCFC 56.2; *Christensen v. United States,* 60 Fed.Cl. 19, 27–28 (2004). Second, disputes of fact arising with remedial issues rest upon a different footing because this Court, not the agency, is the fact-finder as to those issues. Such disputes can arise with consideration of equitable factors such as prejudice or injury to one or more of the parties or with respect to the public interest. As to such matters, the Court considers whether there are genuine disputes of material fact the resolution of which must occur by way of a trial or evidentiary hearing. *See Tippett v. United States,* 185 F.3d 1250 (Fed.Cir.1999). *Cf. Long Island Sav. Bank, FSB v. United States,* 60 Fed.Cl. 80, 87, 96, 2004 WL 392911 at *6, *16 (2004).

Contracting Officer, on April 1, 2003. AR B. 42, T. 152, at 24, 42. This aspect of PGBA's proposal was also the subject of discussions between SSEB and PGBA during the post-initial-offer period. *See supra*, at 201. PGBA alleges that during the ensuing discussions, the Chair of the SSET criticized PGBA's proposal on the "data access" subfactor for its lack of specificity in terms of the number of government employees who would be given access to beneficiary claim processing data. Compl. ¶ 30; Pl.'s Mot. at 23–26; Pl.'s Reply at 11–14. During the discussion held on April 9, 2003, the following exchange took place between representatives of TMA (Maj. Ryan and Ms. Navarro) and a representative from PGBA (Mr. Pendleton):

MAJ. RYAN: Okay. Next question. It's not clear which government personnel would have access to Execu-dash, and who would have access to the raw data with [B]usiness [O]bjects. Please discuss which government employees or agencies would have access, and at what level?

MR. PENDLETON: That's up to the government to decide. We hope to implement Execu-dash in such a way that it satisfies almost all of your reporting needs.

It is up to the government to determine which employees or agencies have access to Execu-dash, or the raw data, with Business Objects, and we will support, essentially, whatever you decide there. So in essence, every single employee could have access to the raw data, if that's how you decide to implement.

We should suggest that careful consideration be given to data security, and how raw data is handled and downloaded, et cetera.

. . .

MAJ. RYAN: There's not a minimum standard for training. We wanted to know what your process was, and how to provide that. The minimum standard that I referred to is the number of people that would have access to the data.

MR. PENDLETON: I do not recall seeing a number in terms of access, either, in the RFP.

MS. NAVARRO: We can—we might want to take a caucus on that. Okay.

We're going to caucus for a moment, and we'll get that reference for you.

MR. PENDLETON: Okay.

[Caucus taken.]

MAJ. RYAN: The reference I'm referring to is C–3.5.3.

MR. PENDLETON: Could we caucus that—3.5.—

MAJ. RYAN: 3.5.3.

MR. PENDLETON: Okay.

MS. NAVARRO: Okay. We're off the record.

[Off record discussion.]

MS. NAVARRO: Okay. Back on the record.

MAJ. RYAN: Okay. I've been told that I need to read this into the record. And it's C–3.5.3.

"The contractor shall establish, maintain, update and make accessible a data repository that assures timely and reliable electronic access for government designated individuals."

"Minimum access shall include two authorizations at each MTF, ten authorizations at each Surgeon General's office, two authorizations at Health Affairs, two authorizations at TMA, Washington; two authorizations at TMA, Aurora; and authorizations, not to exceed two, for on-site government representatives."

"Access requires ongoing user training and support, software user friendly, ad hoc query capability, report generation ability, and export capability."

MR. PENDLETON: PGBA certainly commits to meeting those requirements. In fact, we plan to significantly exceed them. And we'll update on that.

MAJ. RYAN: Do you wish to be more specific about how you plan to exceed them?

MR. PENDLETON: Conference on that?

MR. HORTON: We'd like to caucus.

MS. NAVARRO: Okay. We're off the record.

[Off record discussion.]

MS. NAVARRO: We're back on the record.

MR. PENDLETON: We understand the government's concern on this subject, and as stated, we certainly commit to meeting the requirements as in the RFP, and in fact, exceeding them. We will detail how we will do that in the final revision to our proposal.

AR B. 42, T. 152, Tr. pp. 19:5–21 and 23:12 through 25:10. A short time after the exchange set forth above, Maj. Ryan made the following additional statement regarding data access:

Okay. I guess I just had kind of one closing comment, then. If you're not more explicit in the final proposal revision, that may create or that may cause a higher risk rating.

AR B. 42, T. 152, Tr. p. 69:16–19.

PGBA avers that as a result of this exchange, when it submitted its final revisions to its proposal, PGBA added specificity to the "Data Access" portion of its proposal and this specificity was then held against PGBA by the SSEB. It contrasts the adverse treatment it received with the uncritical evaluation accorded WPS. *See* Pl.'s Mot. at 25–28; Pl.'s Reply at 11. PGBA provided a written response to the question that was discussed with the SSEB, stating "PGBA will initially support access for up to 200 users of Execu–DASH, with 50 of those users having access to raw data through Business Objects." AR B. 11, T. 61 at 58.

The corresponding portion of WPS's initial proposal related to data access was also cryptic and generic, providing simply that "WPS will provide a data repository with electronic access for the requested Government-designated individuals," AR B. 12, T. 62 at 293, and that WPS would provide support and training on its proprietary software to "the MTFs, the Surgeon General's Office, Health Affairs, TMA–Washington, TMA–Aurora, Government Officials located at WPS, Regional Directors and Intermediate Service Commands." AR B. 12, T. 62 at 317. Prior to and during its discussions with the SSEB, WPS did not receive a question related to the number of government employees who would receive access to WPS's data. The only

"data access" question posed to WPS involved the company's contingency procedures for emergency situations in which work could not be conducted at its primary site. AR B. 14, T. 67 at 9; AR B. 42, T. 151 at 8. WPS provided a written response to this question, but it was not discussed at WPS's discussion session with the SSEB. AR B. 42, T. 151.

In evaluating the offerors on the "Data Access" subfactor, the SSEB ultimately rated PGBA "yellow" with "low risk" and awarded WPS a rating of "blue" with "low risk." AR B. 15, T. 71 at 47; *see supra*, at 201. The final report of the SSEB Chair conceded the lack of clarity in TMA's RFP, asserted that the indefinite nature of the RFP was intentional, and described the reasoning for PGBA's low rating as follows:

[PGBA's proposal] does not meet the minimum requirement in Section C–3.5.3. PGBA does not offer access to the data repository for the minimum number of users specified. The RFP purposely did not specify the number of MTFs since the number of MTFs does change in small increments over time. The number of MTFs is available to the public through several different avenues. Offerors could have used the TRICARE Management Activity website or they could have gone directly to each services' Surgeon General's websites. While it is feasible to obtain slightly different numbers of MTFs, depending on the source used, PGBA was under the mark by at least 73 MTFs. PGBA proposed access for 200 users. Paragraph C–3.5.3. of the RFP requires access for 10 users at each Surgeon Generals' *[sic]* office (total of 30), plus two each at Health Affairs, TMA–Washington and TMA–Aurora (total of 6), plus a maximum of 2 users on-site with the contractor. These add up to 38 users. This leaves only 162 users to be distributed among the MTFs. Assuming two users per MTF, this calculates to 81 MTFs. This is significantly lower than the number of MTFs, no matter what source was used to calculate the number of MTFs. We were able to find 154 MTFs by searching the internet (*www.tricare.osd.mil/mtf/main.cfm*). This list did not include the Coast Guard MTFs so this

source gave us the lowest number of MTFs. Even using this source, PGBA was under estimating the number of users by 146. This is a weakness because access to the data repository is essential to enable Government employees to generate ad hoc reports in a timely manner. Lack of access or delays in access could negatively impact the Government's decision making process.

AR B. 15, T. 81 at 128. In describing the rating of WPS as "blue" for data access, the SSEB Chairman's report did not discuss specific numbers of users, stating simply "WPS will provide data repository access/authorization for Regional Directors and Intermediate Service Commands, which exceeds the RFP requirements, and also offers a multifaceted approach to training Government users." AR B. 15, T. 82 at 131.

In the course of her consideration of the proposals, Gen. Adams changed the SSET's rating of PGBA from "yellow" to "green." AR B. 5, T. 41, Tr. p. 79:20–21; AR B. 15, T. 69 at 5. She did not change the risk rating. Gen. Adams described her decision to change this rating as hinging upon "the lack of specificity in the RFP regarding ... access" and "PGBA's commitment to provide additional access rights if the government desires":

> In my opinion, PGBA defined the minimum requirement as a number between the 200 they specified and their commitment to provide additional Government access to data. *An additional reason to change the rating from "Yellow" ... is the lack of specificity in the RFP regarding how much access to data is required by the Government.... The lack of a total number in the RFP to define the Government's data access requirement, and PGBA's commitment to provide additional access rights if the Government desires,* is the basis for me to void the Marginal/Yellow rating. Therefore, I conclude that for Subfactor 5, Data Access, PGBA "meets specified minimum performance or capability requirements necessary for contract performance" and earns a rating of Acceptable/Green.

AR B. 15, T. 69 at 8 (emphasis added). *See also* AR B. 5, T. 41, Tr. pp. 79:20 through 87:3.

The record supports PGBA's assertion that TMA erred both in the lack of clarity in the RFP respecting data access and in the SSEB's irregularity and inconsistency in evaluating this technical subfactor. As the SSA noted, the RFP was not adequate to demand the degree of specificity apparently sought by the SSEB Chair. Moreover, there was no basis for the SSEB to demand both clairvoyance and specificity on the part of PGBA but not of the other offerors. Such uneven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion. *See Doty v. United States,* 53 F.3d 1244, 1251 (Fed.Cir. 1995) ("When procedural violations committed by the agency are egregiously removed from fairness, this constitutes an abuse of the agency's administrative discretion."); *Gentex Corp.,* 58 Fed.Cl. at 653 ("The lack of clarity in the RFP, the discussions which suggested that Scott, but not Gentex, consider a CAIV tradeoff in connection with batteries, and the Air Force's failure to correct Gentex's differing understanding of the evaluation scheme of the RFP combined to render this procurement unfair."); *Banknote Corp. of Am., Inc. v. United States,* 56 Fed.Cl. 377, 383 (2003) ("it is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria"); *TLT Constr. Corp. v. United States,* 50 Fed.Cl. at 216 ("A fundamental principle of government procurement is that [the agency] treat all offerors equally and consistently apply the evaluation factors.").

Moreover, the Court finds that General Adams's attempts to rectify the shortcoming, while laudable and well-intended, constituted only a partial amelioration of the problems evident in the record. The SSEB's proposed ratings for this subfactor were markedly divergent, and General Adams's adjustment affected only PGBA's result. With the adjustment, WPS remained one rating ahead of PGBA as to the subfactor, *see supra,* at 201, and General Adams made no effort to do a

comparability analysis which would have examined carefully the relative merit of both PGBA's and WPS's proposals respecting data access.

A full assessment of prejudice turns on an evaluation of this fault along with an analysis of PGBA's other claims. However, PGBA's proposal was fully within the zone of consideration for a contractual award, and the SSA's and SSEB's handling of the data-access element shows an unequal and unfair treatment of PGBA in an area where the RFP concededly lacked clarity and the offerors had to rely on TMA to rectify the resulting ambiguity. That the SSEB affirmatively misled PGBA's representatives rather than curing the ambiguity goes a long way toward showing prejudice.

### 2. The transition-in subfactor.

■ WPS received a higher rating than PGBA respecting one other technical subfactor—the "transition-in" subfactor. Under the rubric of that subfactor, TMA evaluated the offerors' proposals according to how they planned to address the array of logistical issues expected to arise as a result of consolidating all of the TRICARE for Life claims under one processor. Specifically, the TDEFIC RFP described the transition-in subfactor as follows:

> Transition In will be evaluated by considering the offeror's approach to implementing [TDEFIC] in a manner that ensures that all aspects of the program are fully operational according to the requirements of the prospective contract to include transitional activities. The offeror's comprehensive implementation plans and proposed approach to minimizing disruption to beneficiaries, the timeline for reaching crossover agreements with Medicare carriers and fiscal intermediaries, and the proposed process for start-up training, docu-

mentation and user support products for data access will be evaluated.

AR B. 8, T. 52 at 494.

PGBA argues that its "green/acceptable" rating was unjustified, that it should have received a "blue/exceptional" rating, and that TMA erred in granting a higher rating to WPS. Pl.'s Mot. at 15–23. The portion of PGBA's proposal addressing this element of the RFP consisted of a baker's dozen presentation slides, AR B. 10, T. 56 at 339–51, while WPS's corresponding proposal contained sixty-eight slides as well as a supplemental transition plan and hiring plan specifically addressing elements of the transition-in subfactor. AR. B. 12, T. 62 at 220–87, 341–500.[12] The SSEB and the SSA generally credited PGBA's proposal as being adequate to show that the company could make the transition but were unimpressed with the amount of detail included in PGBA's proposal. They specifically stated that PGBA's proposal in this respect did not evince strengths that would justify giving PGBA an "exceptional" rating. For example, the SSA in her Source Selection Memorandum opined that although PGBA's "transition plan is detailed, and they have previous experience with TRICARE for Life," PGBA's transition-in proposal "does not exceed Government requirements, and therefore, does not earn an Exceptional/Blue Rating." AR B. 15, T. 69 at 7. Similarly, the SSEB Chair noted in this respect that "no weaknesses were identified," but PGBA's proposal did not "merit[ ] the assignment of a rating of 'Exceptional.'" AR B. 15, T. 71 at 30–31.

PGBA takes issue with these conclusions. PGBA advances its challenge first by averring that TMA ignored vital information about PGBA's prior accomplishments under its TRICARE for Life subcontracts. Pl.'s Mot. at 17 ("TMA failed to give PGBA credit for its existing trained staff, infrastructure, and equipment."). However, accompanying

12. The difference between the two proposals on a simple basis of volume was summarized by the SSEB Chair in a supplemental Memorandum for the Record discussing his conclusions about "whether [WPS] has demonstrated the ability to perform the work required under the [TDEFIC]." AR B. 15, T. 88 at 182. "With respect to transitions, [the SSEB Chair noted that] WPS has

devoted 68 pages of slides, or more than one-fifth of their entire technical proposal, directly to the sub-factor of transitions. (By way of contrast, PGBA presented 13 slides on transition, which represented less than 5 percent of their slides.) ... [WPS] also submitted for informational purposes a 53-page transition plan and a multi-page hiring plan." *Id.* at 183.

PGBA's assertions are numerous references to instances where the record reflects that members of the SSEB specifically considered what resources PGBA already had in place as well as differences between PGBA and the others in terms of transition effort required. *See, e.g.*, Pl's Mot. at 15–18 (citing evaluators' comments found in AR B. 9, T. 54; B. 16, T. 101; B. 34, T. 137); Pl.'s Reply at 5–7. Moreover, as the government and WPS argue, Def.'s Opp. at 13–15; Interv.-Def.'s Reply at 4, the record reflects that TMA did, in fact, give consideration to PGBA's incumbent status when evaluating this element. However, rather than simply considering incumbency to be a "strength" justifying an "Exceptional" rating, TMA viewed PGBA's prior accomplishments as justification for a "Low" risk rating in conjunction with the transition-in subfactor. *See* AR B. 5, T. 41 at 44, Tr. p. 172:21–22. Notably, PGBA itself phrased the salient parts of its proposal in terms of risk related to transition activities, promising minimal transition risk on four of its twelve substantive proposal slides. *See* AR B. 10, T. 56 at 340, 341, 344, 351. In light of the requirements for a "Low" risk rating,[13] PGBA's incumbent status and the transition steps it had already taken as a subcontractor justify TMA's determination that PGBA would likely be able to succeed in implementing the plan it proposed. That incumbent status, however, did not mandate that TMA give PGBA extra credit outside what was reflected in its transition plan.

PGBA argues that as the incumbent processor of more than 80% of TRICARE for Life claims, it should have been ranked more highly than WPS, who, as the holder of a less than 20% share, would have to increase greatly its capacity and facilities. *See* Pl.'s Mot. at 15; Pl.'s Reply at 4–10. PGBA avers that TMA should have given greater consideration to the fact that it already had much of the infrastructure and many of the systems in place. PGBA points to various examples of "milestones" in the transition-in process that it had allegedly already achieved by virtue of its incumbent status, Pl.'s Mot. at 15, and much of its proposal on this subfactor consisted of a list of "milestones" accompanied by the word "Complete." AR B. 10, T. 56 at 342–46. PGBA notes that, from its prior experience as a TRICARE for Life sub-contractor it already had Trading Partner Agreements[14] in place with all of the MEDICARE fiscal intermediaries in the country, and upon award of the TDEFIC would simply be required to undergo an administrative change of names on such agreements. Pl.'s Mot. at 17 (citing AR B. 10, T. 56 at 344).[15] PGBA also asserts that its incumbent status would engender a smaller disruption for fewer beneficiaries during the transition period than WPS would be able to accomplish. Pl.'s Mot. at 16–17; Pl.'s Reply at 10.

The weakness ascribed to PGBA's proposal by TMA, however, stems from the lack of detail reflected in its transition plan. The RFP envisioned that each offeror would submit a "comprehensive description" of "how the offeror will minimize disruption to beneficiaries." AR B. 8, T.52 at 478. Because PGBA's "comprehensive description" consisted largely of a recitation of things it had already accomplished (and impliedly on which it need not expend much additional effort) together with a representation that PGBA would meet the requirements of the RFP, the SSEB and SSA determined that nothing in PGBA's proposal reflected a benefit to the government above and beyond the base requirements of the solicitation. General Adams described PGBA's proposal as "business as usual" and explained that "PGBA's approach to transition is based on their current business with minimum expan-

---

13. TMA's Acquisition Plan defined a Low risk rating as follows: "Has little potential to cause disruption of schedule, increased cost to the Government, or degradation of performance. Normal contractor emphasis and normal Government monitoring will probably be able to overcome any difficulties. Little doubt exists that the offeror can execute the requirements of the RFP using the methods and/or techniques proposed." AR B. 15, T. 99 at 272.

14. *See infra*, at 213.

15. WPS, by contrast, had pre-existing TPAs with thirteen Medicare intermediaries only in the two geographic regions it served as a TRICARE for Life sub-contractor. Pl.'s & Interv.-Def.'s J. Mot. to Clarify the Record (Mar. 12, 2004).

sion." AR B. 15, T. 69 at 22. The SSEB Chair in his final report simply described PGBA's transition plan as not meriting the assignment of a Blue rating. AR B. 15, T. 71 at 30–31. The SSEB Chair summarized that "PGBA's approach seems reasonable and adequate." AR B. 15, T. 81 at 128. The SSEB members' minimal recorded comments also reflect a recognition that PGBA's incumbency would benefit the company during any transition but described its plan in terms of being "adequate in view of their being an incumbent" and "meet[ing] the RFP requirements." AR B. 16, T. 101 at 95–96.

TMA's evaluations regarding "transition in" are supported by the evidence in the record. For example, PGBA's proposal emphasizes its incumbency for approximately 80% of TRICARE for Life claims, AR B. 10, T. 56 at 98, but it does not include an explanation of how PGBA would minimize disruption for the remaining one-fifth of the dual-eligible population it would take on under the TDEFIC. *Cf.* AR B. 12, T. 62 at 257–60, 264, 280 (WPS proposal slides addressing efforts to minimize disruption to beneficiaries). Beyond its position as the incumbent with the lion's share of current responsibility, PGBA points to no factor in its proposal that demonstrates that PGBA would have exceeded the transition requirements of the RFP. Finally, PGBA overlooks the fact that each offeror's previous experience under the TRICARE for Life subcontracts as they previously existed was specifically analyzed and considered as part of an entirely separate evaluation factor—"Past Performance." *See infra,* at 216–18.[16] In short, PGBA presented a less-than-thorough proposal in terms of the "transition-in" subfactor in contrast to WPS's submission of details that more specifically responded to the information sought in the RFP. Regarding this technical subfactor, the record supports TMA's decision. *See Overton Park,* 401 U.S. at 416, 91 S.Ct. 814; *Int'l Res. Recovery, Inc. v. U.S.,* 60 Fed.Cl. 1, 6 & n. 6.

### 3. The claims-processing subfactor.

■ PGBA and WPS each received a Blue/Exceptional rating for the claim-processing subfactor. PGBA challenges several of the "discriminators" that the SSA and the SSEB applied in rating WPS as Blue and in justifying payment of WPS's higher cost. In this connection, PGBA alleges that the SSA misunderstood WPS's proposal as well as the applicable law and regulations that apply to the interaction between Medicare intermediaries and TRICARE claims processors. Pl.'s Mot. at 34.

First, PGBA argues that TMA incorrectly believed that WPS would be able to recover certain "cross-over" fees paid by TRICARE to Medicare intermediaries. Second, PGBA argues that TMA inappropriately credited WPS's assertions that WPS would be able to negotiate favorable terms in Trading Partner Agreements with Medicare intermediaries. PGBA further argues that WPS incorrectly promised to apply a lower processing charge to claims that have to be reprocessed when the TDEFIC contractor would only be paid once for the processing of any given claim. Finally, PGBA argues that the SSA mistakenly interpreted WPS's representations regarding its proposed efforts to filter out "duplicate claims" when WPS actually proposed merely to respond to problems that TMA identified.

As an initial matter, PGBA argues that the SSA's consideration of any discriminators that were not explicitly listed in the RFP is improper. This argument is unavailing. The RFP specifically provided that the evaluators would consider elements of any proposal that demonstrated that an offeror would "exceed the Government's minimum requirement." AR B. 8, T. 52 at 493. Indeed, consideration of commitments to exceed minimum requirements by providing additional benefit to the government lies at the heart of the "Blue" rating. *See supra,* at 199 n. 4.[17] *See Banknote Corp.,* 56 Fed.Cl. at 387 ("[I]t

---

**16.** TMA appears to have given PGBA the benefit of a Low risk rating on Transition–In and a Confidence rating on Past Performance, despite certain transition problems PGBA experienced in the early months of TRICARE for Life. *See infra,* at 217.

**17.** Notably, PGBA does not argue that TMA erred in giving consideration to its own strengths in arriving at its Blue rating for the Claims Processing and Beneficiary and Provider Satisfaction subfactors.

is well-settled that 'a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.'") (quoting *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 45 (1997)).

(a.) Cross-over fees.

After a dual-eligible beneficiary or his or her health care provider submits a claim to Medicare, a Medicare fiscal intermediary will process the claim, pay the portion covered by Medicare, and determine whether the beneficiary appears eligible for TRICARE benefits. AR B. 5, T. 41 at 204–205. The Medicare intermediary responsible for that claim will then transmit the claim payment information to a TRICARE claims processor (*i.e.,* PGBA or WPS under the existing sub-contractor scheme or the TDEFIC contractor in the future) for payment of the remaining portion. *Id.* Such a claim is referred to as a "cross-over claim." *Id.;* AR B. 15, T. 69 at 13 ("A cross-over claim is a claim that is paid by Medicare and then sent to TRICARE to pay the beneficiary's remaining out-of-pocket expenses."). When the TRICARE claims processor receives such information, that processor is charged a "cross-over fee." Def.'s Counter–Stmt. of Facts at 37, ¶ 73. This fee is assessed whenever information is exchanged between TRICARE claims processors and a Medicare intermediary, even in instances when a claim was submitted erroneously, *e.g.,* when a claim is sent to TRICARE for someone who is not eligible for a TRICARE benefit or when it is sent to TRICARE prior to Medicare's paying its portion. AR B. 5, T. 41 at 204–205. The rate for such fees is determined by law, and during the period relevant for this case was set at 69 cents for Medicare Part A claims and 54 cents for Medicare Part B claims. *Id.* When considered in terms of the approximately 27 million claims processed under TRICARE for Life annually, the cost of erroneous cross-over fees could be substantial, *see* AR B. 5, T. 41 at 16, Tr. p. 60:8–16, but the record does not indicate the actual volume of erroneously paid cross-over fees. *See* AR B. 5,

T. 41 at 205, Tr. p. 611:15–18. The mechanism by which such fees are charged is set forth in a Trading Partner Agreement reached between the Medicare intermediary and the TRICARE claims processor. *See infra,* at 213.

PGBA argues that the SSA incorrectly believed that WPS would be able to recoup mistakenly paid benefit payments when she noted as a strength that WPS would utilize its position as a Medicare processor to "[g]et back money from Medicare Fiscal Intermediaries/Carriers for claims that shouldn't have crossed over." Pl.'s Mot. at 31 (quoting AR B. 15, T. 69 at 19).[18] Based on this perceived mistake, PGBA avers that the weight given to WPS's "strength" in this respect was unreasonable and unfounded. For its part, the government asserts that the SSA's statements referred to recouping cross-over fees that should not have been paid to Medicare intermediaries, not actual Medicare benefit money, and that she was fully cognizant of that fact. Def.'s Opp. at 21.

In its proposal, WPS asserted that it would "Monitor/recover payments for erroneous submissions by Medicare to reduce TMA expense" and that "we [WPS] know how to negotiate the best agreements [with Medicare intermediaries] to minimize unnecessary crossover claims. We'll also assign staff to recover charges on claims that should not have been crossed over." AR B. 12, T. 62 at 66. The SSA considered this representation by WPS as a strength, pointing in her Decision Memorandum specifically to WPS's proposal "to get money back from Medicare Fiscal Intermediaries for claims that should not have crossed over when the benefit is a Medicare benefit but is not a TRICARE benefit." AR B. 15, T. 69 at 13. *See also id.* at 19. When PGBA's counsel questioned Gen. Adams during the GAO hearing, Gen. Adams explained, regarding the recovery of erroneous cross-over fees, "when I say get money back, we are talking about the cross-over fees, not talking about benefit dollars, but crossover fees that are represented by

18. PGBA also challenges WPS's assertions that it would be able to negotiate favorable terms in its Trading Partner Agreements in relation to re-

coupment of erroneously paid cross-over fees. *See infra,* at 213.

those crossover claims." AR B. 5, T. 41 at 15, Tr. p. 54:20–23.

The parties have not adequately addressed the actual ability of the eventual TDEFIC contractor to recover erroneous cross-over fees. PGBA argued that the contractor would not have access to the Medicare Trust Fund, regardless of whether the contractor was also a Medicare claims processor, and thus as a matter of law could not recover such fees once they had been paid. Pl.'s Mot. at 34. The government and WPS have countered that the cross-over fees are not, in fact, paid into the Medicare Trust Fund and, accordingly, are not beyond recoupment as a matter of law. Def.'s Counter–Stmt. of Facts at 37–38; Interv.-Def.'s Opp. at 19.

PGBA further argues, however, that regardless of whether the contractor in actuality could recover some or all of any mistakenly-paid cross-over fees, at the time the SSA evaluated the proposals she was under the belief that WPS was proposing to recover benefit payments and that such mistaken belief undermines the reasonableness of her evaluation of this element. Pl.'s Reply at 16–18. The evidence on the record is conflicting about Gen. Adams's understanding of WPS's statement that it would make efforts to "get money back" from Medicare intermediaries. In support of its contention, PGBA cites to Gen. Adams's statements made at PGBA's debriefing session on August 4, 2003. Pl.'s Reply at 17. At that session, PGBA's attorney (Ms. Karelis), General Adams, and Mr. Frey had the following exchange:

MS. KARELIS: Could you, though, explain what it means to get money back from Medicare intermediaries?

MS. ADAMS: Well, I presume that money had been paid to a TRICARE beneficiary for something that should have been paid for by Medicare, and I do not have first-hand knowledge of how the money changes hands, but that they would then recoup from whoever was paid the money erroneously.

MS. KARELIS: And as in the money that we're talking about, do you have an understanding of whether it's—we're talking about benefit—benefit payments?

MS. ADAMS: Yes. But you're not going to be paying money unless it's tied directly. Claims are tied to the benefits, so it's, what is the benefit, what is the Medicare benefit, what is Medicare supposed to pay for. Then after Medicare pays, what is TRICARE held accountable for? Then if it's not a Medicare benefit, then TRICARE becomes the first payer. All those rules that have to be followed.

MR. FREY: Yeah, I'd like to give a little more information to supplement what Nancy has said. The TDEFIC contractor will pay the Medicare carriers, or intermediaries a crossover rate. And so if you focus on minimizing or eliminating those claims, it should never have been crossed over in the first place, there should be moneys that are recoverable that represent those rates.

AR B. 9, T. 54 at 216–217.

The government argues that the SSA in fact knew exactly what she was evaluating and appreciated the complexities of the payment scheme. Def.'s Opp. at 20–21. WPS similarly argues that Gen. Adams "clearly understood that WPS proposed to recover erroneously paid crossover fees." Interv.-Def's Opp. at 17. Both the government and WPS cite to Gen. Adams's subsequent testimony at the GAO hearing in support of their argument, but neither cites to any earlier contemporaneous record indicating what her understanding was when she was making the award decision or giving her mistaken explanation during PGBA's debriefing.

The Court finds that the record supports PGBA's assertion that the SSA was mistaken regarding what money WPS would "get back" in relation to erroneously paid crossover claims. The language in the SSA's Decision Memorandum is ambiguous as to her understanding on this point. The best evidence available to the Court to clarify her meaning is her statement made at the debriefing shortly after such Memorandum was written, rather than her later testimony before GAO, in light of the fact that the two are conflicting. Although this apparent error relates only to one of the "discriminators" used by TMA to determine WPS's blue rating, the Court finds that it was nonetheless potential-

ly prejudicial to PGBA given that (1) TMA assigned importance to it as part of the justification for making an award to the high bidder, (2) the error also reflected a misunderstanding of the scope of WPS's commitment to negotiate favorable Trading Partner Agreements, *see infra,* and (3) PGBA was admittedly competitive in the solicitation and very "close" to WPS.

(b.) Trading Partner Agreements.

PGBA takes issue with WPS's assertions that it could negotiate favorable terms with Medicare processors under so-called "Trading Partner Agreements" or "TPAs." Pl.'s Mot. at 38. The TDEFIC contractor will be required to enter into TPAs with the various Medicare fiscal intermediaries that are responsible for administering Medicare claims. AR B. 50, T. 171 at 1292, ¶ 2.2. Such TPAs exist to enable the exchange of claims payment information from Medicare to TRICARE, enabling the determination of benefits to be paid by TRICARE. Pl.'s Mot. at 34; Def.'s Counter–Stmt. of Facts at 37, ¶ 73. TPAs address various issues ranging from the logistics of how one party's computers communicate with another's to the fees paid by the party requesting information. PGBA argues that WPS's representation that it could better negotiate the terms of such agreements was self-aggrandizing boasting and was contrary to regulations in place at the time TMA was considering the TDEFIC proposals.

In its proposal, WPS represented at least twice that it would provide value to the government through negotiation of favorable terms in its TPAs. First, WPS asserted,

[a]s the largest Medicare Part B processor, we know what's possible to limit crossover charges to TMA and to what Medicare carriers must agree in recovery of charges for claims they submit in error. There are lots of 'shades of gray' that can be negotiated in Trading Partner Agreements including filtering of duplicate claim submissions, Medicare as secondary payer and where Medicare is seeking more information.

AR B. 12, T. 62 at 65. Second, WPS stated, "we know how to negotiate the best agreements to minimize unnecessary crossover claims." *Id.* at 66.

At the time TMA considered the TDEFIC proposals, the agency responsible for administering Medicare (the Centers for Medicare and Medicaid Services ("CMS") within the Department of Health and Human Services) had promulgated a "standard" TPA to be used with all Medicare intermediaries and had prohibited any modifications to the terms of such agreement. Def.'s Counter–Stmt. of Facts at 40, ¶ 79.[19] This prohibition on modifying the terms of the standard TPA was in effect when TMA was evaluating the TDEFIC offerors' proposals. It was first issued by CMS on May 9, 2003—several weeks after the offerors submitted their final revisions. *Id.* CMS subsequently repealed the standard TPA in August 2003 and has not reinstated it as a mandatory contract for Medicare intermediaries. AR B. 4, T. 40 at 322–330. Thus, the standard TPA was only in effect from May through August 2003— when the TDEFIC award was being made.

The SSA testified before GAO that at the time she evaluated the proposals, she "had the understanding that [WPS] could negotiate something different [in the TPAs] because [WPS] spoke to that in their presentation, in terms of areas of negotiation between themselves and the fiscal intermediary contractors that they referred to as gray areas, which suggested to me that there were some things that were not pre-established in terms of the standard Medicare agreements." AR B. 5, T. 41 at 40–41, Tr. pp. 157:22–158:4. Because of this misunderstanding on the part of the SSA and the SSEB, the government has conceded that it "might have had an equitable claim for perhaps a price adjustment or some other consideration under the contract for WPS *not being able to perform* [on this element of its proposal]." Hr'g Tr. at 72; *see also* Def.'s Opp. at 21.

TMA thus erred in its consideration of WPS's commitment to negotiate favorable

---

**19.** A copy of the standard TPA was submitted as part of PGBA's challenge before GAO. AR B. 1, T. 2 at 91–113.

terms in its TPAs. Although at the time WPS submitted its proposal, there was no standard TPA that prevented it from negotiating terms, WPS was so barred during TMA's final consideration and when the decision about the award was made. In response, TMA has argued that it "froze" the record for consideration on April 28, 2003, when the final proposal revisions were submitted. Hr'g Tr. at 71–72. However, this decision regarding the record could not foreclose consideration of changes in the law regarding Medicare. The TRICARE for Life program necessarily depends upon the framework and template supplied by Medicare, and any changes in the Medicare pattern would have to be taken into account regarding a TRICARE for Life contract. Nonetheless, the repeal of the standard TPA reduces the significance of this error to the point that it, standing alone, may not be prejudicial. Even so, the Court is left with the strong sense that WPS's "strength" in negotiating favorable TPAs is largely illusory, being more attributable to puffery and "essay writing" than reality. *See, e.g., International Res. Recovery,* 60 Fed.Cl. at 6 n. 6.

(c.) Other claims-processing discriminators.

PGBA raises two challenges related to electronic claims in its attack on TMA's "blue" rating of WPS for the claims-processing subfactor. First, PGBA asserts that TMA incorrectly credited WPS's "promise to reprocess claims at the electronic rate if the claim was originally submitted electronically as justification for its premium." Pl.'s Mot. at 39 (citing AR B. 15, T. 69 at 13). PGBA points out that in one of the pre-proposal questions that TMA answered, *see supra,* at 200 n. 6, TMA points out that it would only pay once for each claim received, and thus WPS would not be authorized to charge for reprocessing at all, regardless of the rate. Pl.'s Mot. at 40 (citing AR B. 41, T. 146 at 16–17). The government notes that the answer cited by PGBA "provides examples of instances when exceptions may be made to the 'general rule' of a single payment." Def.'s Opp. at 22. In light of such exceptions, PGBA conceded that some small benefit to the government may accrue in relation to WPS's representation, though it asserts that "[f]or at least a large number of those,

this savings is zero." Pl.'s Reply at 20. TMA evaluated this particular element in light of the other points in WPS's proposal, and such overall consideration of what constitutes the best value to the government is well within TMA's discretion. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.").

Similarly, PGBA challenges the propriety of finding a "strength" in WPS's assertions that it would increase the rate of electronic submissions. Pl.'s Mot. at 41. The SSA testified before GAO that approximately ten percent of the relevant claims are currently paper-based. AR B. 5, T. 41 at 29, Tr. p. 112:14–21. She also specifically stated that "any decrease in that … would be a cost savings because the paper claim costs approximately four times as much to process as an electronic claim." *Id.* at Tr. p. 112:18–21. PGBA concedes that there is some benefit to the government in reducing paper-based claims but avers that WPS's ability to provide such benefit "is minimal." Pl.'s Reply at 20. Again, the SSA's inclusion of this minor element in her consideration of overall best value to the government was within her discretion. *See E.W. Bliss,* 77 F.3d at 449.

In its proposal, WPS represented that it would make "[d]aily payment runs and TED transmissions to TMA" in an effort "to achieve the best possible customer satisfaction with payment timeliness." AR B. 12, T. 62 at 57. The SSA noted such daily runs as a strength in her Source Selection Memorandum. AR B. 15, T. 69 at 13. PGBA asserts that General Adams subsequently "testified that this 'strength' accrues to the benefit of WPS, not the government." Pl.'s Mot. at 42. Gen. Adams testified at the GAO hearing that, in her opinion, the daily payment runs were representative of "efficient business processes" and that such processes could lead to "cost efficiencies." AR B. 5, T. 41 at 31, Tr. p. 118:18–23. As regards the potential benefit to the government, she specifically stated that "anything a contractor pays, sooner or later the government pays." *Id.* at Tr. p. 121:1–2. PGBA's counsel specifically

asked Gen. Adams if she "[saw] it as improving contractor efficiency and thereby ultimately saving the government money," which General Adams answered affirmatively, noting that "on our end too we get to more efficiently and effectively manage that work load." *Id.* at Tr. p. 121:7–12. There is no reason for this Court to find that the SSA's consideration of daily payment runs by WPS as a strength was unreasonable or unfounded.

Finally, PGBA again asserts that General Adams did not understand the actual implications of WPS's proposal regarding the prevention of duplicate claims.[20] In WPS's proposal, the company presented a two-step approach to addressing the problem of payment on duplicate claims. First, by way of negotiated TPAs with Medicare intermediaries, it proposed "filtering of duplicate claim submissions" prior to payment of such duplicate claims. AR B. 12, T. 62 at 65 (Slide No. 26). *See also supra,* at 213. Second, WPS proposed to resolve any payments on duplicate claims in a timely manner, faster than the minimum timeliness requirements set forth in the RFP. AR B. 12, T. 62 at 86 (Slide No. 47). The SSA noted in her Source Selection Memorandum that WPS "propose[d] to resolve potential duplicate claims more timely." AR B. 15, T. 69 at 13. She further wrote that WPS would "filter for duplicate claim submission to avoid payment of charges that will later need to be recouped." *Id.* at 19. Before GAO, PGBA's counsel questioned General Adams about her understanding of the duplicate-claim payment issue and WPS's proposal. AR B. 5, T. 41 at 33, Tr. pp. 123–129. PGBA argues that Gen. Adams believed "that WPS proposed to preclude duplicate claims from occurring." Pl.'s Mot. at 43. However, the statement by Gen. Adams that PGBA cites for this contention is merely a discussion in general terms of what a duplicate claim is

and her understanding that because a duplicate claim "has the potential then to be paid twice[;] . . . the idea . . . is to preclude that happening." AR B. 5, T. 41 at 33, Tr. p. 127:3–6.[21] Again, the Court finds no error in the SSA's conclusions as to this element, although it is not readily apparent that WPS offered much beyond good "essay writing" and self-serving representations regarding elimination of duplicate claims.

### 4. The beneficiary-and-provider-satisfaction subfactor.

Both PGBA and WPS received a Blue rating for the beneficiary-and-provider-satisfaction subfactor. The RFP describes the standard for evaluating this subfactor as follows:

> Satisfaction will be evaluated on the basis of the offeror's ability to establish and maintain beneficiary and provider satisfaction at the highest level possible throughout the period of performance, through the delivery of customer friendly program services. The Government will evaluate customer service modes of access, staffing, quality monitoring, proposed methods of measuring satisfaction and the standard and measurements approaches proposed, as well as the offeror's commitment to modify customer service approaches, as necessary, to maintain the required level of service.

AR B. 8, T. 52 at 494. The SSA identified three "strengths" for WPS under this subfactor in her Decision Memorandum—(1) WPS's commitment to exceed certain timeliness standards, (2) WPS's commitment to train staff members on Medicare benefits and allow customer service staff to deal with Medicare directly on claims issues, and (3) WPS's commitment to communicate to beneficiaries and providers if their claim was forwarded to Medicare for processing. AR B. 15, T. 69 at 20.[22] PGBA, in turn, had two strengths rec-

---

20. *See infra,* at 217–18 n. 25.

21. As noted by the government and WPS in their briefs, there was some confusion during PGBA's questioning of General Adams before GAO as to what aspect of WPS's proposal General Adams was addressing. Def.'s Opp. at 23–24; Interv.-Def.'s Opp. at 23–24. From her testimony, however, it is apparent that she did, in fact, under-

stand what WPS's proposal entailed as well as the benefit that would accrue to the government of having a contractor address duplicate claim issues timely and effectively.

22. The SSEB Chair's report also indicated as a "strength" the fact that WPS committed to having staff available on a number of federal holidays. AR B. 15, T. 71 at 54.

ognized—(1) PGBA's commitment to exceed several timeliness and accuracy standards, and (2) PGBA's commitment to answer telephone calls more quickly than required and to answer "completely on the initial call." *Id.* Comparing the two, General Adams opined that "[t]he WPS approach that links Medicare processing with TRICARE provides a depth of customer service that extends beyond merely improving processing times and answering phones and correspondence faster." *Id.* at 21.

PGBA asserts that the SSA and the SSEB Chair misunderstood the portion of WPS's proposal supporting the first "strength." Specifically, PGBA argues that Gen. Adams believed that WPS was promising to answer all of a beneficiary's questions, including Medicare questions, which would have been impossible without access to the "Medicare system, which WPS would be strictly prohibited from using by a host of federal laws." Pl.'s Mot. at 44. For its part, WPS has asserted that it proposed to provide "advocacy services for its beneficiaries," meaning that "its customer service representatives would work with the beneficiaries and contact the [M]edicare contractors on their behalf to help resolve . . . issues." Hr'g Tr. at 83–84.

PGBA further argues that, regardless of how WPS intended for its proposal to be interpreted, in fact the SSA understood it to mean that WPS would provide callers with answers to Medicare questions. Pl.'s Mot. at 44 ("The key is that the SSA believed it at the time she made her decision."). In support of its contention, PGBA refers to General Adams's statement made during PGBA's debriefing session that: " 'they say their training will provide experts in Medicare and TRICARE, and that if the beneficiary calls, even though it is a Medicare question that could be handled by Medicare, that they will take the lead in providing the response. . . . The other commitment that they made in relationship to that was that, as much as possible, they will try to provide a complete response on the first phone call.' " Pl.'s Mot. at 44 (quoting AR B. 9, T. 54 at 217–18). By this commentary, General Adams specifically

indicated that WPS would "take the lead" on answering such questions, and she recognized that WPS would not be able to provide complete answers to all questions, noting that *"as much as possible,* they will *try* to provide a complete response." AR B. 9, T. 54 at 218 (emphasis added). Furthermore, shortly after General Adams made the statements quoted above, PGBA's counsel specifically asked her if her analysis reflected WPS's "existing Medicare business?" *Id.* at 219. General Adams responded, "No." *Id.* On this record, there is no indication that the SSA expected WPS to provide anything beyond customer service staff who were trained to have a "[t]horough knowledge of Medicare benefits," AR B. 12, T. 62 at 137, and who would work to provide the customer "advocacy services" that WPS described in its proposal. *Id.* at 138, 143.

Second, PGBA argues that its own proposal was stronger than WPS's in regards to providing Medicare training to its staff. Pl.'s Mot. at 44–45. This argument asks that the Court substitute its own evaluation of what the two companies proposed. Such a weighing of the evidence by a reviewing court is not proper in these circumstances. *See Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. Moreover, PGBA has made no effort to explain why the SSA was wrong in crediting PGBA as well as WPS with a strength regarding the same element, where both proposals addressed the element and presented benefits to the government in excess of the minimum requirements.

## C. TMA's Evaluation of Past Performance

The offerors' past performance was evaluated in the first instance by the PRAG, who relied on information provided by the offerors as well as information obtained through Contractor Performance Evaluations ("CPEs") about PGBA's and WPS's experience processing TRICARE for Life claims.[23] Def.'s Counter–Stmt. of Facts at 19–20. The CPEs were evaluations conducted by TMA in connection with the pre-existing contracts and sub-contracts implementing the TRICARE for Life program. AR B. 29; Def.'s Counter–Stmt. of Facts at 19–20. The RFP

23. [* * *].

explained that "[a]ssessing an offeror's past performance is the Government's method of evaluating the credibility of an offeror's proposal and their [sic] capability to meet performance requirements." AR B. 8, T. 52 at 495. The standard to be applied was explained as follows: "The Government will evaluate past performance as it relates to fulfilling the functional requirements of all elements in Section C of this request for proposals (RFP) and the extent to which the offeror's evaluated past performance demonstrates compliance with the requirements of FAR 52.219–8 ... and FAR 52.219–9." AR B. 8, T. 52 at 495. The goal of the Past Performance evaluation was "to determine a confidence level in an offeror's ability to successfully perform all requirements." *Id.* All three offerors received a rating of "Confidence" in the past-performance factor, but the SSA determined that "there is sufficient difference in WPS' past performance to rank WPS first in performance." AR B. 15, T. 69 at 16. Although the PRAG gave PGBA a past-performance rating of "Confidence," it stated in its Final Report that "reservations exist as to [PGBA's] ability to perform the required effort without significant government oversight." AR B. 15, T. 73 at 98. PGBA asserts that this criticism has no adequate basis in the record. Pl.'s Mot. at 47–53.

As part of its proposal, each offeror submitted to TMA certain information about its top five accounts to provide information about its past performance on claims processing. The PRAG initially determined that the documents PGBA submitted with its proposal were inadequate. AR B. 15, T. 73 at 98. The PRAG reported that it "became concerned that relevant information may have been omitted from the evaluation process" and conducted its own interviews with PGBA's two largest customers—MCS prime contractors for whom PGBA processed TRICARE claims as a subcontractor. *Id.* at 99–

100; *see also* AR B. 15, T. 94 at 213. The PRAG also reported that "PGBA did not provide information relevant to the requirements of FAR 52.219–8 and 52.219–9 concerning utilization of small, small disadvantaged and women-owned small businesses." AR B. 15, T. 73 at 102. The PRAG's evaluation of all of PGBA's relevant information showed that PGBA had "directly relevant past performance and would be capable of performing the work required under the TDEFIC contract," as explained by the SSEB Chair in his initial report to the SSA. AR B. 15, T. 94 at 213.

In addition to the information contained with the proposals, the PRAG and the SSA reviewed final reports from the CPEs that had been conducted for WPS and PGBA in the summer of 2002 in relation to their performance under the TRICARE for Life subcontracts. AR B. 5, T. 41 at 23–24, Tr. pp. 89–90; *see also* AR B. 29.[24] These CPEs covered the earliest stages of the TRICARE for Life program's implementation, specifically the first eight and one-half months of its existence between October 2001 and mid-June 2002. AR B. 29, T. 29 at 3. The CPEs for WPS and PGBA were based on the same sample size—30 claims selected at random from each of the categories of TRICARE for Life claims that the companies processed. AR B. 5, T. 41 at 25; AR B. 29, T. 29 at 9; AR B. 29, T. 30 at 258–259. The final reports from both CPEs acknowledge that this small sample size is "not statistically valid, [but] they were considered reflective of the processing action for each sample." AR. B. 29, T. 29 at 9; AR B. 29, T. 30 at 259.

PGBA challenges the SSA's and PRAG's determinations that PGBA would likely require government oversight going forward. Pl.'s Mot. at 50; *see* AR B. 15, T. 69 at 16; AR B. 15, T. 73 at 98. PGBA argues that this conclusion was not justified by PGBA's CPE reports.[25] Pl.'s Mot. at 49–50. However, for a number of the problems identified in

---

**24.** Four CPE Final Reports were written for PGBA—one for each MCS prime contractor for whom PGBA processed TRICARE for Life claims. AR B. 29, T. 29 at 1, 61, 141, 199. These reports are largely duplicative of one another and "specific findings and observations in [any] report applied equally to all of the Prime Contractors." *Id.* at 3. Because these reports were

developed concurrently and by the same staff, *id.,* the Court refers to these evaluations as if PGBA had undergone only one CPE.

**25.** PGBA also argues that TMA improperly chose not to conduct discussions with PGBA regarding negative material in its CPE report. Pl.'s Mot. at 53. As a general matter, when an agency con-

its CPE, the evaluation team specifically required that future reports or audits of PGBA's practices be submitted. *See, e.g.,* AR B. 29, T. 29 at 10 ("a deficiency shall be issued and shall remain open pending verification"), 12 ("evidence of compliance shall be the results of a focused audit"), 32 (PGBA and its prime contractor "shall ... complete focused audits"). WPS's CPE also required a number of supplemental reports or audits. *See, e.g.,* AR B. 29, T. 30 at 266, 269, 272. Much of the oversight foreseen in WPS's CPE was included as part of WPS's and its prime contractor's own proposals to address problems they had identified, with the evaluation team accepting the proposed corrective action plans. *See, e.g., id.*

PGBA alleges that TMA unfairly considered the difficulties it experienced during the early days of the TRICARE for Life program. Pl.'s Mot. at 49 ("most of those errors were attributable to extraordinary start-up conditions that would *not* continue into the future"). PGBA's CPE acknowledged that the company faced significant hurdles in "implement[ing] an admittedly complex and unprecedented TRICARE program in a relatively short period of time." AR B. 29, T. 29 at 3. Indeed, the CPE final report calls PGBA's efforts to implement the program "laudable." *Id.* at 4. The report goes on to state, though, that "by the end of the evaluation, the team concluded that despite an overall successful implementation of the TFL ['TRICARE for Life'] Program, many operational areas require critical re-evaluation, re-training, and re-thinking of work processes by the Prime Contractors and PGBA." *Id.* The report discusses problems identified in a number of areas, focusing on claims payment, internal quality control procedures, and training. *Id.* Specifically, within the field of internal management controls and quality assurance, the CPE concluded that "[t]hese are the types of problems that should have been readily evident internally and addressed quickly. At the time of the review, this had not been done." *Id.* at 5.

WPS's CPE was not spotless. The review of WPS resulted in a number of findings of problems and criticisms of that company's implementation of the TRICARE for Life program. *See, e.g.,* AR B. 29, T. 30 at 259 (overpayments), 263 (Explanation of Benefit message errors), 266 (overpayments), 270 (duplicate claims). In several respects, problems noted in WPS's CPE were of a lesser comparative scale and scope than corresponding problems in PGBA's CPE. *Compare* AR B. 29, T. 29 at 30–32 ("[a]pproximately 40% of the duplicate claims identified by PGBA are actual duplicates"), *with* AR B. 29, T. 30 at 270 (73% "actual duplicates" under WPS). The SSA noted that "[t]here were significant performance deficiencies by PGBA and WPS documented in the TRICARE for Life Contract Performance Evaluations." AR B. 15, T. 69 at 16. However, comparing the two, the SSA concluded in her Decision Memorandum that differences in the types of deficiencies were notable as well as the ways in which the companies identified and responded to such problems:

> For WPS, most of the problems were of limited scope and had already been recognized by WPS. In many instances, changes were implemented by WPS to correct the problems and to preclude the inaccurate payment of broad categories of claims. The review performed at PGBA found systemic inaccuracies as well as individual faults that resulted in broad categories of overpayments. PGBA failed to recognize some of the errors until the TMA review team called them to their attention. In terms of both quantities of findings, as well as a delay by PGBA in identifying the problems, I find WPS' performance to be superior when compared to PGBA as it relates to the past performance within the category defined by "Confidence."

*Id.*

The issue of overpayments weighed on the SSA's evaluation of PGBA's past perform-

---

ducts discussions with a bidder about problems in its proposal, such discussions must be "meaningful," that is " 'they [must] generally lead offerors into the areas of their proposals requiring amplification or correction.' " *Banknote Corp.,* 56 Fed.Cl. at 384. This standard reflects that pre-award discussions are intended to allow a bidder to address procedural problems with its proposal and to allow the bidder to correct oversights or omissions. "[B]oth the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer." *Id.*

ance in the TDEFIC solicitation. Among other issues noted in PGBA's CPE, the report stated that "[m]illions of dollars in duplicate and incorrect payments were made during the first nine months of implementation." AR B. 29, T. 29 at 5. The report further stated that "[w]hile recent changes demonstrated to the [CPE evaluation] team have likely corrected some of these major problem areas, it was clearly noted during the review that significant quality and accuracy issues still existed." *Id.* Gen. Adams testified before GAO that when evaluating PGBA's past performance she took into consideration allegations that the company had made $100 million in overpayments on "duplicate claims." [26] AR B. 5, T. 41 at 27, Tr. p. 103:9–17 ("It did figure into my review of the past performance. In terms of the, the—their approach then to claims payment and their attention to the details and how important it is to, to pay the claims appropriately."). PGBA argues that General Adams appears to have come by the account of such overpayments through a conversation with a TMA employee who was not part of the TDEFIC solicitation evaluation team. Pl's Mot. at 51 (citing AR B. 5, T. 41 at 49, Tr. p. 192:5–22). PGBA's actual level of overpayments for duplicate claims during this period was, it avers, on the order of two million dollars. *Id.* at 52; *see also* AR B. 29, T. 29 at 31. The government claims that PGBA made initial overpayments in aggregate in excess of ninety million dollars. Def.'s Opp. at 29 (citing AR B. 52, T. 178 at 89); AR B. 5, T. 41 at 26–27, Tr. pp. 101–103. Concededly, by the time of the CPE, the great bulk of any such overpayments appears to have been recouped. AR B. 29, T. 29 at 5, 31.

The Court gives no credence to the claim that PGBA made $100 million in overpayments on duplicate claims. And, the record supports TMA's determination that it could be confident that PGBA would perform the TDEFIC duties. Nonetheless, the record also supports the SSA's conclusion that PGBA would likely require more government oversight going forward than WPS, based on the comparative experiences of the two institutions. The Court thus finds no prejudicial error in the SSA's overall finding regarding past performance.

### D. TMA's Consideration of Price

The P/CT conducted an evaluation of the final price proposals [27] submitted by each of the offerors and found WPS's and PGBA's prices to be reasonable and realistic reflections of the respective technical proposals and [* * *]. AR B. 15, T. 72 at 69, 85. The P/CT's evaluation drew on information submitted by the offerors as well as information from audits conducted by the Defense Contract Audit Agency ("DCAA"). *Id.* at 80; Def.'s Counter–Stmt. of Facts at 19. PGBA asserts that the P/CT's analysis and conclusions were flawed and that TMA did not accurately value WPS's proposal in terms of staffing costs, particularly in light of a $[* * *] million price reduction that accompanied WPS's final proposal revisions. Pl.'s Mot. at 53–56. PGBA in effect asks this Court on review to find that WPS's highest-price proposal should actually have been even higher.

PGBA asserts that the P/CT unreasonably relied on a statement by WPS that its workload under the TDEFIC would be [* * *] its current workload, arguing that "[t]here is no plausible way for the overall effort to process 100 percent of the claims to be [* * *] the

---

**26.** "Duplicate claims" occur when a health care provider submits a paper request for payment to PGBA and Medicare submits an electronic cross-over claim for the same treatment. PGBA's CPE explains the occurrence of duplicate claims as follows:

> Because TFL is new, and many providers and beneficiaries were unfamiliar with the program, paper claims were being submitted for duplicate services that were first transmitted electronically as Medicare crossover claims. On crossover claims, PGBA programmed the system to accept the provider number that was

provided by Medicare. On paper claims, PGBA Associates keyed the provider number and the suffix. Because the system read the electronic claim as one unique claim and the paper claim as another, these claims paid as duplicates.

AR B. 29, T. 29 at 32.

**27.** As noted *supra*, at 201, each offeror changed its price in conjunction with its final proposal revisions—[* * *]—with WPS nonetheless remaining the highest bidder by a considerable margin (over [* * *]% higher).

effort to process 18 percent." *Id.* at 54 (citing AR B. 15, T. 72 at 76). For its part, WPS asserts that its statement to the DCAA accurately reflected the fact that WPS's TRI-CARE business *"as a whole"* was [* * *] the TDEFIC workload. Interv.-Def.'s Opp. at 61. The P/CT explained that WPS indicated that its staffing rates "are based on its projected budget which assumes that the TDEFIC contract will be WPS'[s] only TRI-CARE effort and that [WPS] indicated that the effort is [* * *]." AR B. 15, T. 72 at 82. More generally, as regards WPS's staffing expenses, the P/CT's final report specifically recognizes that "WPS['s] approach is labor intensive," AR B. 15, T. 72 at 68, that WPS would need to acquire "some new hires," *id.* at 76, and that the P/CT included WPS's staffing levels and salary rates in its evaluation. *Id.* at 81–82.

PGBA's challenge on this element amounts to a claim that the P/CT was not sufficiently critical of WPS's underlying assertions related to how many staff members it would require to perform under the TDEFIC given the fact that WPS decreased its price proposal [* * *]. However, such an inquiry comparing WPS's initial and final proposals was beyond the purpose and scope of the P/CT's evaluation. *See id.* at 68–69 (reasonableness analysis consisted of comparison of total prices to each other and stating that "all three offerors' total evaluated prices are comparable, and as such, are considered reasonable"), 80 ("Cost realism results will be assessed in terms of proposal risk."); *see also* AR B. 8, T. 52 at 496 (proposal prices to be analyzed for "reasonableness" and "cost realism"). There is evidence that the price difference between WPS's initial and final proposals was predicated on the use of differing predictions for the volume of claims to be processed. AR B. 15, T. 72 at 81–82. Given this record, the Court will not disturb TMA's analysis of the offerors' prices.

Similarly, the Court is not in a position to second-guess TMA's decision that the considerably higher price to be paid WPS was justified by the enhancements WPS tendered. WPS's final offer was $[* * *] million, or over [* * *]%, higher than PGBA's offer. Yet, the SSA concluded that WPS

offered the government better value. This determination cannot by itself be deemed error by the Court—a best value judgment that is "grounded in reason" cannot be overturned by the Court even if it might have made a different choice. *Widnall v. B3H Corp.*, 75 F.3d 1577, 1580 (Fed.Cir.1996).

E. PGBA's Request for Equitable Relief

■ PGBA requests that this Court declare TMA's decision to award the TDEFIC to WPS to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and that the award be set aside. Compl. at 14. These requests amount to a prayer for injunctive relief because they would bar WPS and the government from going forward with the TDEFIC as awarded and effectively mandate a new round of solicitation, proposals, evaluations, and a new contract award. To obtain an injunction, PGBA would be required to show the following: (1) success on the merits of its challenge, (2) that PGBA would suffer irreparable harm if the relief were not awarded, (3) that granting the injunction would serve the public interest, and (4) that the harm PGBA would suffer outweighs the harm that the government, WPS, and any third parties would suffer. *See Mangi Envtl. Group, Inc. v. United States*, 47 Fed.Cl. 10, 19 (2000) (citing *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir.1993)).

■ As noted *supra*, at 202–03, to succeed on the merits of its challenge, PGBA is required to show that TMA's award to WPS was based on significant errors and that those errors were prejudicial to PGBA. *See Advanced Data Concepts*, 216 F.3d at 1057. The Federal Circuit has explained that determining the issue of prejudice to an unsuccessful bidder involves an inquiry into whether "there was a reasonable likelihood that [the unsuccessful bidder] ... would have been awarded the contract" absent such errors. *Id.* (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996)). In this case, there is substantial evidence on the record that the proposals of PGBA and WPS were, in fact, "very close" and that TMA considered both companies capable of carrying out the TDEFIC. *See* AR B. 15, T. 69 at 5 ("all three offerors were in the competitive

range"); B. 42, T. 152, p. 47, Tr. p. 4:18–19 ("You [PGBA] have been determined to be in the competitive range for this requirement."); Hr'g Tr. at 63:5–24. In light of the arbitrary and capricious actions of TMA in relation to its consideration of the data-access and claims-processing subfactors, discussed *supra,* at 207–08, 212 and 213, PGBA has made a successful showing on the merits of its challenge.

PGBA alleges that it will suffer two forms of harm if it is not awarded the TDEFIC. First, it argues that it will have been denied the opportunity to compete in a fair and competitive bidding process, which in and of itself should constitute irreparable harm. Pl.'s Reply at 31. In support of this proposition, PGBA cites *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744 (2000). *See* Pl.'s Reply at 31. *Overstreet* explains that "[w]hen assessing irreparable injury, 'the relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" 47 Fed.Cl. at 743 (quoting *Magellan Corp. v. United States,* 27 Fed.Cl. 446, 447 (1993)). In the solicitation in *Overstreet,* all of the bidders' price proposals were rejected as unreasonably high and the solicitation was converted to a negotiated procurement. 47 Fed.Cl. at 730. The Court found that the plaintiff there had suffered irreparable harm because the determination to change to a negotiated procurement was arbitrary and, in the context of a negotiated solicitation, the plaintiff "inevitably would obtain the contract at a lower price, thereby significantly reducing its potential for profit." *Id.* at 744. PGBA's showing of error in this case is not accompanied by a showing that it would "inevitably" suffer harm comparable to that in *Overstreet* even if the TDEFIC solicitation were conducted anew.

Second, PGBA alleges that "loss" of the TDEFIC will "put at risk the jobs of nearly [* * *] employees." *Id. See also* Horton Affid. ¶ 2–4.[28] This harm is significant, but PGBA's reliance on the loss of its current employees as a basis for irreparable injury would require this Court to consider any incumbent contractor's loss of a successor contract to be irreparable harm.[29] In addition, PGBA's arguments that it would be irreparably harmed are undermined by the fact that PGBA elected not to seek a further injunction against the implementation of the TDEFIC following GAO's decision to deny its protest and that of Unisys. The transition period is closing rapidly, with the changeover scheduled to occur April 1, 2004, *see* Hr'g Tr. at 9–10, and any disruptions to that schedule would adversely affect the new hires WPS has made equally with the PGBA employees.

Respecting the public interest underlying an injunction, it is well established that the public interest is well-served by ensuring that the government procurement process is fair. *See Sierra Military Health Services,* 58 Fed.Cl. at 584; *PGBA,* 57 Fed.Cl. at 663. The public also has an important interest in the effective and efficient operation of the TRICARE health benefits system; disrupting and delaying the transition to the new TDEFIC framework potentially could affect millions of American service retirees and families of service members and retirees. *See* Compl. ¶ 12; *see generally Sierra Military Health Services,* 58 Fed.Cl. at 584–85.

Balancing the hardships between the government and WPS on the one hand and PGBA on the other, the Court determines that adequate justification does not exist to set aside the contract and require a new round of solicitation. This procurement has already lasted nearly one and one half years, from the issuance of the RFP in September 2002 to the anticipated work commencement date of April 1, 2004, and WPS avers that it has expended significant resources preparing

---

28. The Court allowed the submission of an affidavit of William R. Horton, president of PGBA, to supplement the Administrative Record with information relating to PGBA's potential injuries. *See Esch v. Yeutter,* 876 F.2d at 991 (exception 8 to the general rule regarding review on the administrative record before the agency).

29. The government has committed to paying "retention incentive bonuses to all outgoing TRICARE contractor employees in order to entice them to continue their efforts through the transition period." Pl.'s Reply at 33 (citing Horton Affid. at ¶ 6). To a small extent, this benefit will ameliorate the injury related to PGBA's loss of jobs.

for implementation. Interv.-Def.'s Opp. at 63; Interv.-Def.'s Reply at 24. Revoking the contract and requiring a new solicitation would likely engender an additional delay of at least the same length.[30] In light of these considerations, the Court determines that the balance of hardships weighs in favor of denying PGBA's request for declaratory relief.

■ In a bid protest case, 28 U.S.C. § 1491(b)(2) provides that "[t]o afford relief in such an action, the court[ ] may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." In the circumstances of this case, the Court has determined that PGBA is entitled to recover its reasonable costs incurred in preparing its proposal for the TDEFIC solicitation. "[A] losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposal submitted was arbitrary or capricious or in violation of applicable statute or regulation." *Gentex Corp.*, 58 Fed.Cl. at 656 (citing *CSE Constr. Co. v. United States*, 58 Fed.Cl. 230, 262–63 (2003); 28 U.S.C. § 1491(b)(2)). In light of the errors discussed above and because PGBA was prejudiced by such errors, PGBA may recover its bid preparation and proposal costs. The amount of such recovery shall be determined through further proceedings in this action.

### F. PGBA's Motion for Reconsideration

After the opinion and order was filed under seal on March 31, 2004, PGBA timely filed a motion for reconsideration requesting that the Court revise its ruling on remedy to issue a specific type of injunctive relief, *i.e.*, an order setting aside the award to WPS and requiring the agency to reevaluate the proposals and make a fresh award. Mot. for Recons. at 2 (citing *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 207 (D.C.Cir.1984);

*Griffy's Landscape Maint. LLC v. United States*, 46 Fed.Cl. 257, 261 (2000); and *Aerolease Long Beach v. United States*, 31 Fed. Cl. 342, 372 (1994)). PGBA moved for reconsideration "to avoid manifest injustice," Mot. for Recons. at 1, arguing that the Court's finding of significant errors materially affecting the bidding process required that at least the newly requested form of injunctive relief be issued.

Pursuant to RCFC 59(a)(1), the Court "may grant a motion for reconsideration when the movant shows 'either that: (a) an intervening change in the controlling law has occurred, (b) evidence not previously available has become available, or (c) that the motion is necessary to prevent manifest injustice.'" *Bannum, Inc. v. United States*, 59 Fed.Cl. 241, 243 (2003) (quoting *Citizens Fed. Bank, FSB v. United States*, 53 Fed.Cl. 793, 794 (2002)). PGBA's motion satisfies none of these criteria.

First, it is axiomatic in federal law that an injunction " 'is not a remedy which issues as [a matter] of course.' " *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (quoting *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–38, 53 S.Ct. 602, 77 L.Ed. 1208 (1933)). "Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims." *Romero–Barcelo*, 456 U.S. at 312, 102 S.Ct. 1798 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944)). In fulfilling its responsibility to sit as a court of equity in this bid-protest case, the Court was guided by long-standing precepts:

> In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Railroad Comm'n v. Pullman*

30. PGBA's argument that WPS's implementation costs to date could simply be recovered by operation of the government's right to terminate the contract for convenience, Pl.'s Reply at 33, is unpersuasive and disregards the fact that even if WPS's transition costs might be ultimately recoverable should the contract be terminated, WPS nonetheless would have to bear the financial costs of its expenditures until reimbursement occurred. Interv.-Def.'s Reply at 24 (citing testimony of a WPS vice-president at AR B. 5, T. 41 at 231, Tr. p. 714:5–21). *See also* 48 C.F.R. § 52.249–2(g)(2)(i).

*Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). Thus, the Court has noted that "[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff . . . ." *Yakus v. United States, supra,* 321 U.S. at 440, 64 S.Ct. at 675 (footnote omitted). The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and *a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law. TVA v. Hill,* 437 U.S., at 193, 98 S.Ct., at 2301; *Hecht Co. v. Bowles,* 321 U.S., at 329, 64 S.Ct., at 591.

*Romero–Barcelo,* 456 U.S. at 312–13, 102 S.Ct. 1798 (emphasis added). In short, as a jurisprudential matter, this Court was not obliged to grant equitable relief "for every violation of law," *id.* at 313, 102 S.Ct. 1798, and, as explained above, consideration of the public interest indicated that no such grant was appropriate in this case.

Second, PGBA argues that "Section 706 of the Administrative Procedure Act ['APA'] requires certain action on the procurement when the Court finds that the agency was arbitrary and capricious [in its award]." Mot. for Recons. at 2 (citing and quoting 5 U.S.C. § 706 ("the reviewing court *shall . . .* hold unlawful *and set aside* agency action . . . .") (emphasis by PGBA)). This argument fails on statutory grounds. In bid-protest cases in this Court, Section 706 of the APA supplies *only* the standard of review. *See* 28 U.S.C. § 1491(b)(4). The governing remedial provision is not that of the APA but rather that specified in 28 U.S.C. § 1491(b)(2), quoted *supra,* which provision incorporates traditional equitable principles plus authority to grant a limited award of money damages where appropriate.

PGBA has shown no grounds for granting reconsideration of the opinion and order previously issued under seal, and thus the motion for reconsideration is denied.

## CONCLUSION

For the reasons set forth above, PGBA's motion for judgment upon the administrative record is denied in part and granted in part. The government's cross-motion for judgment upon the administrative record is denied in part and granted in part. WPS's cross-motion for judgment upon the administrative record is granted. PGBA is denied declaratory relief, but it may recover its reasonable bid preparation and proposal costs in an amount to be determined after further proceedings in this action. PGBA also is awarded costs pursuant to 28 U.S.C. § 2412(a).

On or before April 30, 2004, the parties shall submit a Joint Status Report addressing the following matters: (1) the amount of PGBA's reasonable bid preparation and proposal costs, (2) the need for discovery related to such costs, (3) a proposed schedule for further proceedings in this case, and (4) the need for WPS to remain a party to this action in light of this opinion and order.

Prior to the release of this opinion and order to the public, the parties shall review this unredacted opinion for competition-sensitive, proprietary, confidential, or other protected information. The parties shall file proposed redacted versions of this decision on or before April 8, 2004.

It is so ORDERED.

